```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :   SEALED
UNITED STATES OF AMERICA           :   INDICTMENT
                                   :
          -v.-                     :   12 CRIM 938
                                   :
XIA PING WEN,                      :
   a/k/a "Wendy,"                  :
                                   :
          Defendant.               :
                                   :
- - - - - - - - - - - - - - - - - x
```

COUNT ONE

The Grand Jury charges:

BACKGROUND ON THE ASYLUM PROCESS

1.   Pursuant to federal immigration law, to obtain asylum in the United States, an alien is required to show that he or she has suffered persecution in his or her country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or has a well founded fear of persecution if he or she were to return to such country.

2.   Alien applicants seeking asylum are required to complete a form called a Form I-589 to the United States Citizenship and Immigration Services ("USCIS"). The Form I-589 requires a detailed and specific account of the basis of the claim to asylum. If the Form I-589 is prepared by someone other than the applicant or a relative of the applicant, such as an attorney, the preparer is required to set forth his or her name and address on the form. The alien applicant and preparer are required to sign the petition under penalty of perjury. The alien applicant must typically apply for asylum within one year of their arrival in the United States.

JUDGE STEIN

3.  After the Form I-589 is submitted, the alien applicant is interviewed by a USCIS officer (the "Asylum Officer") to determine whether the applicant qualifies for asylum. At the interview, the applicant can present witnesses or documentation in support of his or her asylum claim. After the interview, the Asylum Officer determines whether the alien applicant qualifies for asylum, and that determination is then reviewed by a supervisory officer within USCIS.

4.  If an alien applicant is granted asylum, he or she receives a completed Form I-94 that reflects that the USCIS has granted him or her asylum status. The grant of asylum typically applies to the applicant's spouse and children as well. An alien who has a Form I-94 can apply for, among other things, lawful permanent resident status. A grant of asylum status does not expire, although USCIS can terminate asylum status if, among other things, it is later discovered that the applicant obtained asylum through fraud or no longer has a well founded fear of persecution in his or her home country.

5.  If the Asylum Officer determines that the applicant is ineligible for asylum status, and if the applicant is in the United States illegally, the matter is referred to an Immigration Judge at the Executive Office for Immigration Review. The Immigration Judge holds a hearing during which the alien applicant, and commonly an immigration lawyer, appear before the Immigration Judge and present evidence in support of the asylum application. In New York City, all immigration hearings take place in New York, New York. After the hearing, the Immigration

2

Judge renders a decision on the alien's asylum application. If the Immigration Judge denies the asylum application the applicant may appeal that decision to the Board of Immigration Appeals ("BIA"). If the applicant loses his or her appeal before the BIA the applicant may appeal to a federal court.

### THE SCHEME TO DEFRAUD

6. This scheme involved the submission of fraudulent asylum applications on behalf of Chinese aliens by law firms in New York City. Through the methods described herein, the defendant, a translator, and her co-conspirators, profited by creating and submitting asylum applications containing false stories of persecution purportedly suffered by alien applicants.

7. Typically, before a law firm involved in the fraud would take on a client, an employee of that firm conducted a screening interview of the potential client. One of the goals of that interview was to determine whether there was any information about the client -- that could be discovered by the USCIS - that would bar the client from receiving asylum. For example, if the client had a passport that showed the client had been in the United States for more than one year the case would likely be rejected by the USCIS.

8. If the client did not have proof that he or she had been in the United States for less than one year an employee at the law firm would typically explain to the client that he or she needed to obtain a letter from a person stating that he or she saw the client in China within the last year (the "One Year Letter"). If the client could not obtain such a One Year Letter,

3

often because he or she had been in the United States for longer than one year, the law firm would often help the client create a false letter or direct the client to somewhere he or she could purchase a false letter.

9. In most instances, the clients of the law firms described generally herein had not actually suffered persecution in China. In those cases, an employee at the law firm explained to the client that, in exchange for money, the law firm would make up a story of persecution and the client would need to memorize that story.

10. If the client did not have any barriers to asylum that could be discovered by the USCIS (such that the law firm had a reasonable chance at winning the case and receiving the most money possible) and if the law firm was satisfied that the client had the capacity to pay the law firm's fees, an employee at the law firm (the "Paralegal") would draft the narrative for the client's asylum application, most importantly making up the client's story of persecution.

11. The Paralegals made up stories of persecution that usually followed one of three fact patterns: (a) forced abortions performed against woman clients pursuant to China's family planning policy; (b) persecution based on the client's belief in Christianity; or (c) political or ideological persecution, typically for membership in China's Democratic Party or followers of Falun Gong.

12. After the Form I-589 asylum application was submitted, the Paralegal often prepared the client for his or her

4

interview with the Asylum Officer. This training often included having the client do outside studying on the topic of persecution claimed in his or her application so that he or she had a better chance of convincing the Asylum Officer that his or her story of persecution was true.

13. On the day of the interview, the law firm often arranged for a translator (the "Translator") to accompany the client to the interview. The law firm typically had one or two Translators that they worked with. The Translator was frequently paid to provide two basic services. One, was to provide additional coaching and training to the client in advance of the interviews (sometimes the translators were paid to train the clients days in advance of their interviews). The Translator, who often had seen hundreds of asylum interviews, advised the clients of questions they were likely to be asked and how to answer them.

14. The Translator was also paid to translate during the interviews. However, the Translator was frequently paid not merely to translate the client's answers from Chinese to English but to do so in a way that was favorable to the client. For example, if the client answered a question in a way that was inconsistent with the fabricated story of persecution the Translator was expected to falsely translate the answer so that it conformed to the story.

### THE DEFENDANT

15. At various times relevant to the charge in this Indictment, XIA PING WEN, a/k/a "Wendy," worked as a Translator

for several law firms that submitted fraudulent asylum applications.

16. XIA PING WEN, a/k/a "Wendy," also provided other services to law firms submitting fraudulent asylum applications, such as selling false One Year Letters.

STATUTORY ALLEGATIONS

17. From in or about 2008, through and including in or about December 2012, in the Southern District of New York and elsewhere, XIA PING WEN, a/k/a "Wendy," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, immigration fraud in violation of Title 18, United States Code, Section 1546(a).

18. It was a part and object of the conspiracy that XIA PING WEN, a/k/a "Wendy," the defendant, and others known and unknown, would and did knowingly and willfully forge, counterfeit, alter, and falsely make an immigrant and nonimmigrant visa, permit, border crossing card, alien registration receipt card, and other document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, and would and did utter, use, attempt to use, possess, obtain, accept, and receive any such visa, permit, border crossing card, alien registration receipt card, and other document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, knowing it

to be forged, counterfeited, altered, and falsely made, and to have been procured by means of a false claim and statement, and to have been otherwise procured by fraud and unlawfully obtained to wit, XIA PING WEN, a/k/a "Wendy," and others coached asylum applicants to lie during interviews with United States Citizenship and Immigration Services which resulted in the clients receiving I-94 Forms, in violation of Title 18, United States Code, Section 1546(a).

### Overt Acts

19. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. In or about 2009, XIA PING WEN, a/k/a "Wendy," the defendant, coached asylum applicants to lie during asylum interviews with United States Citizenship and Immigration Services.

   b. In or about November 2011, XIA PING WEN, a/k/a "Wendy," the defendant, sold an affidavit that falsely claimed an asylum applicant had been in China within the last year.

(Title 18, United States Code, Section 371)

### FORFEITURE ALLEGATIONS

20. As a result of committing the offense alleged in Count One of this Indictment, XIA PING WEN, a/k/a "Wendy," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United

States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to a sum in United States currency representing the amount of proceeds obtained as a result of the offense.

### Substitute Assets Provision

21.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (1) cannot be located upon the exercise of due diligence;

    (2) has been transferred or sold to, or deposited with, a third person;

    (3) has been placed beyond the jurisdiction of the Court;

    (4) has been substantially diminished in value; or

    (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C.

§ 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

XIA PING WEN, a/k/a "Wendy,"

Defendant.

---

### INDICTMENT

12 Cr.

(18 U.S.C. § 371)

_____
                    PREET BHARARA
              United States Attorney.

---

*Indictment filed. under seal*
*A/W issued.*
*F. Moas USMJ*

*RC*
*12/12/12*

10