E1G7WENS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                          12 Cr. 938 (SHS)

5  XIA PING WEN,

6              Defendant.

7  ------------------------------x

8                                          January 16, 2014
                                           3:15 p.m.
9

10 Before:

11                    HON. SIDNEY H. STEIN
                                       District Judge
12

13                        APPEARANCES

14 PREET BHARARA
        United States Attorney for the
15      Southern District of New York
   BY:  REBECCA MERMELSTEIN
16      Assistant United States Attorney

17 COLLEEN BRADY
        Attorney for Defendant
18
   ALSO PRESENT:  CHRISTOPHER DEGRAFF, F.B.I.
19                NANCY WU, Chinese Interpreter

20

21

22

23

24

25

E1G7WENS

```
 1              (Case called)

 2              (In open court)

 3              MS. MERMELSTEIN:  Good afternoon, your Honor.  Rebecca

 4    Mermelstein for the government.  With me is Special Agent Chris

 5    Degraff.

 6              THE COURT:  Good afternoon.

 7              MS. BRADY:  Good afternoon, your Honor.  Colleen Brady

 8    for Ms. Wen.

 9              THE COURT:  Good afternoon.  Swear the interpreter.

10              (Interpreter sworn)

11              THE INTERPRETER:  My name is Nancy Wu, W-u.  Good

12    afternoon.

13              THE COURT:  Good afternoon, Ms. Wu.  Please be seated.

14    We're here for the sentencing of Ms. Wen.  I have the following

15    information.  I have the presentence report prepared on August

16    9, 2010, along with the addendum approved on September 12 --

17    or, I'm sorry.  Did I say 2010?  August 9, 2013 -- along with

18    the addendum approved on September 12, 2013, and the sentencing

19    recommendation approved on the same day.  In addition, I have a

20    submission dated December 30, 2013 from Ms. Brady to the

21    probation officer, and I have the memorandum in aid of

22    sentencing on behalf of the defendant received in chambers on

23    January 6th of this year, along with an extensive number of

24    letters in support of the defendant.  I read all of the letters

25    and indeed all of this information, and I have considered all
```

E1G7WENS

1    of it.  I also have the sentencing memorandum of the government

2    filed on January 10.

3            Ms. Brady, is there any additional information I

4    should have?

5            MS. BRADY:  Your Honor, just for the court's

6    information, I had not heard from Mr. Johnson, the probation

7    officer, about my objections and clarifications, so I e-mailed

8    him this morning, and he had never received the copy I mailed

9    to him.  I then e-mailed my objections and clarifications to

10   him.  He said he would make some of the recommendations but he

11   was going to stand by his sentencing guidelines recommendation

12   for sentence.  He suggested that I ask the court for a short

13   adjournment today, and I said I didn't think that was a wise

14   idea given the logistics of everything.  So, I just wanted to

15   make the court aware of that conversation this morning.

16           THE COURT:  Well, I gather what you have told me is

17   that you faxed this, or sent in some way, this December 30

18   letter to the probation officer today.

19           MS. BRADY:  I mailed it.

20           THE COURT:  No, I understand, but he didn't receive

21   it.

22           MS. BRADY:  He didn't receive it.

23           THE COURT:  What is it you are asking me to do, if

24   anything?

25           MS. BRADY:  He indicated that he was going to make

E1G7WENS

1    some of the adjustments.

2              THE COURT:  Well, I can't adopt the findings of fact

3    in the presentence report if you are going to tell me that the

4    probation office is going to recommend that it be altered.

5              MS. BRADY:  Well, I guess --

6              THE COURT:  What you can do now, if you wish, is raise

7    any objections you wish to raise here, and I will deal with

8    them here now, if that's what you want.

9              MS. BRADY:  All right.

10             THE COURT:  Let's go back to my original question.

11   Was there any additional information I should have apart from

12   the information that I identified?

13             MS. BRADY:  No, your Honor.

14             THE COURT:  All right.  Government?

15             MS. MERMELSTEIN:  No, your Honor.

16             THE COURT:  Now, Ms. Brady, have you had a full

17   opportunity to discuss all of this information with your

18   client, and have you in fact discussed it all with your client?

19             MS. BRADY:  I have, your Honor, at length and with an

20   interpreter at each occasion.

21             THE COURT:  All right.  Now, what points do you wish

22   to raise now in regard to the presentence report, if any?

23             MS. BRADY:  In part A of the PSR, paragraph 2, Ms. Wen

24   coached asylum applicants by way of providing questions that

25   typically would be asked during their asylum hearings.  An

E1G7WENS

example of these questions on the topic of family planning is

attached as Exhibit A.  I also included it in my sentencing

submission to the court.

On paragraph 12 --

THE COURT:  I'm sorry.  What would you like me to do?

What are you asking the court to do in regard to that paragraph

2?

MS. BRADY:  I'm asking to substitute my language for

the one that's in the current report.

THE COURT:  Well, those are two different things.  The

way it now reads it says that she coached other people to lie

during interviews.  And what you have says that she provided

questions that would typically be asked.  I take it the latter

is your position as to what happened.

Government, do you have a position on that?

MS. MERMELSTEIN:  Yes, your Honor.  I think the PSR

should remain as it is.  That's the language from the

indictment that the defendant pled guilty to, but notably I'm

not sure that coaching an asylum applicant on what to expect in

an asylum interview would even be a crime.  The crime is that

she prepared them to lie in their interviews by helping them to

prepare for how to provide answers that were not true.  So, I

think --

THE COURT:  Well, I have some question based on the

allocution which was taken before Magistrate Judge Gorenstein

E1G7WENS

 1    and which I have adopted.  It wasn't entirely a hundred percent

 2    clear as to what she was allocuting to.  I'm quite comfortable

 3    that the allocution covered the elements of the crime, and it

 4    was appropriately sent to me on recommendation by Judge

 5    Gorenstein, and it was appropriately adopted, but I do have

 6    some questions as to exactly what she did.

 7              You are saying that she gave -- proposed false answers

 8    to interviewee applicants during interviews?

 9              MS. MERMELSTEIN:  Not during the interviews, your

10    Honor.  Applicants would sort of memorize the fake story that

11    they were going to present to the asylum officer.  This

12    defendant would meet with applicants in advance of their

13    interview and would essentially practice with them for the lies

14    they were going to tell.

15              THE COURT:  And your position is she knew they were

16    false stories.

17              MS. MERMELSTEIN:  Of course.

18              THE COURT:  Ms. Brady?

19              MS. BRADY:  Your Honor, I think the court's point

20    about the allocution is what is important.  It did make out the

21    elements of the offense, and she never allocuted to falsely

22    translating; it was rather that she was coaching them.

23              THE COURT:  Did she know they were false stories?

24              MS. BRADY:  I believe that the allocution indicates

25    that she did believe they were false or at least thought they

E1G7WENS

1    may be false.

2            THE COURT:  No, I think -- well, you tell me, but I

3    think she allocuted to knowing that they were false stories.

4            MS. BRADY:  I think that's right, your Honor, without

5    looking through the transcript.

6            THE COURT:  Well, your proposed paragraph 2 is very

7    different than paragraph 2 there.  Why don't I alter paragraph

8    2 to say, "It was a part and object of the conspiracy that Wen

9    and others coached asylum applicants to give false stories

10   during interviews."  Ms. Brady?

11           MS. BRADY:  I am happy with that, your Honor.

12           THE COURT:  All right.  I will adopt the findings of

13   fact in the presentence report with the following changes.  The

14   first one is paragraph 2 strike "lie" and put in place "false

15   stories".  What else?

16           MS. BRADY:  On paragraph 12, your Honor, my

17   clarification would be Ms. Wen did not create the asylum

18   application but rather provided the asylum applicants questions

19   that would be asked during their asylum hearing.

20           THE COURT:  Government?

21           MS. MERMELSTEIN:  Your Honor, paragraph 12 describes

22   the scheme generally, not just the conduct of this defendant.

23   It's not the government's position that this defendant created

24   the false application herself, but I think that paragraph 12

25   accurately describes the conduct that was involved.

8

E1G7WENS

1              THE COURT:  Yes, I think that's right, because it says

2       "and her coconspirators".

3              MS. BRADY:  I am happy with that, your Honor.

4              THE COURT:  I'm going to keep 12 the way it is.  Next.

5              MS. BRADY:  Paragraph 20, Ms. Wen never falsely

6       translated.

7              THE COURT:  Do you intend to go through every one of

8       your paragraphs here on this December 30 letter?

9              MS. BRADY:  I think so, your Honor.

10             THE COURT:  All right.

11             MS. BRADY:  And I apologize.

12             THE COURT:  Let me look at paragraph 20.

13             Well, this issue is whether or not when she was

14       translating during the interviews a person said X and she

15       translated it as non X.  That's the issue.

16             MS. BRADY:  That's my understanding.

17             THE COURT:  And your position is that she did not do

18       that.

19             MS. BRADY:  That's correct.

20             THE COURT:  Your position is that if the person said

21       X, even if it was unfavorable, she translated it as X.  Is that

22       correct?

23             MS. BRADY:  Yes.

24             THE COURT:  But you refer to the allocution.

25       Government, what's the government's position?

1          MS. MERMELSTEIN:  Your Honor, we are still in the

2     section governing the scheme generally.  It's describing the

3     work of people who did the translating work in the scheme

4     generally.

5          The allegations against this defendant are actually

6     not that she translated in the interviews but that she prepared

7     people for the interviews.  So, it's not the government's view

8     that she is even being described by this paragraph.  It's not

9     the government's view that she falsely translated answers since

10     she wasn't translating in the interviews.

11          THE COURT:  She did not translate in the interviews?

12          MS. MERMELSTEIN:  She prepared people for the

13     interviews.  She did not accompany them to the interviews to

14     translate for them.  So this description --

15          THE COURT:  I did not realize that.  All right.  Why

16     don't I simply add to paragraph 20 that the defendant did not

17     provide translation services during the interviews.

18     Government?

19          MS. MERMELSTEIN:  No objection.

20          MS. BRADY:  No objection, your Honor.

21          THE COURT:  All right.  I will add that to paragraph

22     20.

23          21?

24          MS. BRADY:  Paragraph 21, Ms. Wen was not paid by law

25     firms or employed by law firms but, rather, she was a

E1G7WENS

1  self-employed translator and was paid by her clients, not the

2  law firms.  Ms. Wen sold one false one-year letter.

3       THE COURT:  Well, I saw that she allocuted to selling

4  one false one-year letter.

5       MS. BRADY:  Correct.

6       THE COURT:  Government, what's your position on who

7  she worked for?

8       MS. MERMELSTEIN:  No objection, your Honor.  The

9  government agrees that she was a self-employed contractor.

10      I don't want to interrupt you, but I am happy to jump

11  ahead to the next one, too.

12      THE COURT:  Let me just do the change on 21.  In place

13  of paragraph 21 I will put "Ms. Wen was a self-employed

14  translator and was paid by her clients, not a law firm.  And

15  Ms. Wen sold one false one-year letter."  Is that the position

16  of the government, that there was only one false one-year

17  letter?

18      MS. MERMELSTEIN:  It is not, your Honor.  The

19  government's cooperating witness in this case who purchased the

20  one-year letter that the defendant allocuted to approached the

21  defendant to do so because the witness was already aware that

22  the defendant had sold these letters in the past.

23      It's true that the defendant didn't allocute to the

24  other letters in her allocution, and it certainly wasn't

25  necessary as part of her allocution, but the government does

E1G7WENS

```
1   not believe it was only one.  I don't think we need to have a
2   Fatico on the matter.  I don't think it affects the
3   government's view of the appropriate sentence in any event.
4           THE COURT:  I understand.  I'm going to change
5   paragraph 21 to the following:  "Ms. Wen was a self-employed
6   translator and was paid by her clients and not a law firm.  Ms.
7   Wen allocuted to selling one false one-year letter; the
8   position of the government is that she sold additional false
9   one-year letters."
10          All right.  Ms. Brady?
11          MS. BRADY:  That's fine, your Honor.  On paragraph 41
12  it's a typo.  "Wen said that she wasn't happy there because her
13  step grandmother never had any biological children of her own."
14  Any being --
15          THE COURT:  Oh, right.  Paragraph 41 the word "ay" is
16  being changed to "any".
17          MS. BRADY:  Correct.
18          THE COURT:  Next.
19          MS. BRADY:  Paragraph --
20          THE COURT:  Let me look.  I see 49.  One moment.
21          In paragraph 49, in the third line, the word Wang,
22  W-a-n-g, should be changed to Yang, Y-a-n-g.
23          On paragraph 50 does the government have any reason to
24  doubt the new figure that the defendant is proposing, that is,
25  8800 rather than 8000?
```

E1G7WENS

|1|              MS. MERMELSTEIN:  We do not.  And I should note we
|2| have no objections to the remainder of the factual corrections.
|3|              THE COURT:  All right.  Thank you.
|4|              Paragraph 50, I'm going to change the amount 8000 to
|5| the amount 8800.
|6|              Paragraph 51, I'm going to change to "Ms. Wen was
|7| never married to her biological son's father.  She married
|8| Ming Zheng Zeng January 1996, and the couple divorced in 2002."
|9|              Paragraph 54, change the name Dr. Lawrence Quan to Dr.
|10| Nicholas Guan.
|11|              The last sentence, add the words at the end of that
|12| sentence "and daily life".
|13|              Paragraph 55, the first line, change the single word
|14| "a psychiatrist" to the plural "psychiatrists".  And in the
|15| last line where it says Mount Sinai Hospital add the phrase "in
|16| 2003".
|17|              Paragraph 58, change 1994 to 1996.
|18|              Paragraph 61, in paragraph 61 change the second
|19| sentence to read as follows:  "She worked as a translator for
|20| individuals who were applying for various benefits, such as
|21| housing, Social Security, medical and immigration status,
|22| including some asylum applications, and earned approximately
|23| $1800 per month."  That's the change in sentence two at
|24| paragraph 61.
|25|              Change paragraph 63 to read as follows:  "Ms. Wen

E1G7WENS

1    presently has no bank accounts.  She has an IRA account and

2    other investments worth approximately $60,000.  As much as she

3    can, Ms. Wen provides financial support to her parents who are

4    elderly and have health issues.

5         All right.  I adopt the findings of fact in the

6    presentence report with those specific changes.  I will return

7    all of this information to the probation department.  That

8    helps with some of my questions, but let me get a better fix on

9    exactly what this defendant did.

10        All right.  I think I have it.  Looking at my notes

11   and hearing what the parties have said, what she would do is

12   she was given the stories, and she knew them to be false but

13   helped the people prepare for their interviews with the

14   Department of Homeland Security and helped them provide answers

15   that were consistent with what she knew to be a false story.

16   Essentially is that the government's position?

17        MS. MERMELSTEIN:  Two clarifications, I suppose.  The

18   interview is actually with the Office of Citizenship and

19   Immigration Services, not the Department of Homeland Security.

20        THE COURT:  That's a subdivision of the Department of

21   Homeland Security.  Go ahead.

22        MS. MERMELSTEIN:  This defendant is right that she had

23   her own company.  That company is what is known in sort of

24   colloquial terms as a travel company.  So, she wasn't just

25   given someone's story and helping them prepare.  Clients would

E1G7WENS

1    come to her as their first stop in seeking asylum, and she

2    would help them with all of the paperwork, and indeed she would

3    then find the lawyer who would actually be the one signing the

4    application.  So, I think her sentencing submission tries to --

5            THE COURT:  She would find the lawyer who what?

6            MS. MERMELSTEIN:  Who would then submit the asylum

7    application.  So the asylum application has a certification

8    from the lawyer on the front.  The clients came first to this

9    defendant, and then this defendant, having helped them prepare

10   all the paperwork, helped them find the lawyer to make the

11   submission on their behalf.

12           THE COURT:  So at what point was the false story

13   devised?

14           MS. MERMELSTEIN:  It was written by others working

15   with the defendant in the travel company.

16           THE COURT:  In her company?

17           MS. MERMELSTEIN:  Correct.

18           THE COURT:  So, is it the government's position

19   that -- and she owned this company?

20           MS. MERMELSTEIN:  That's correct.

21           THE COURT:  So that it was her company, others in her

22   company who developed the false story?

23           MS. MERMELSTEIN:  That is the government's position,

24   yes.

25           THE COURT:  Ms. Brady, what is the defense's position?

E1G7WENS

1           MS. BRADY:  Your Honor, that is not my understanding

2    of what happened.  Ms. Wen did employ certain paralegals, and

3    they assisted with this questioning process and coaching

4    process but did not prepare the stories.  However, in some

5    instances other successful asylum applications were provided to

6    the new incoming applicants as examples of what one could say.

7    Does that make sense?

8           THE COURT:  In other words, here, this was a

9    successful story, you know what to do with it.  Right?

10          MS. BRADY:  Well, maybe not that directly, but this is

11   a successful story, you have to prepare your own story.

12          THE COURT:  Well, that does put a different light on

13   it.  I thought really she was just a hired translator.

14          MS. BRADY:  I mean that was not in every instance,

15   your Honor.

16          THE COURT:  It doesn't have to be.

17          MS. BRADY:  No.

18          THE COURT:  Let me look at a few things in the

19   allocution.

20          MS. BRADY:  Sure.

21          THE COURT:  What's the position of the defense on the

22   false one-year letter?  As I understand it, based on these

23   papers, to be successful in an asylum application you have to

24   have been in the United States for less than one year.  And she

25   was paid $500 to sign somebody else's name to a false one-year

E1G7WENS

1    letter that was given to her that she knew to be false?  In

2    other words, the letter said I know Mr. X, and I know that he

3    has been in the United States for less than one year because A,

4    B, C.  And she was given this letter she says by the government

5    agent -- I take it that's the cooperating witness --

6              MS. BRADY:  Correct.

7              THE COURT:  And she knew it was false.  Presumably she

8    knew who Mr. X was and that he has been in the United States

9    for more than one year.  But she accepted $500 and signed it

10   not Xia Ping Wen but with somebody else's name.  Is that what

11   happened?

12             MS. BRADY:  Yes, your Honor.

13             THE COURT:  Does your client agree with that?

14             MS. BRADY:  Your Honor, essentially that is correct,

15   and she does admit to that.

16             THE COURT:  All right.  All right.  I think I have a

17   better sense of what this defendant did.  I want to hear from

18   the defense attorney as to whatever you want to tell me; then I

19   want to hear from the government; then I will hear from the

20   defendant herself.

21             MS. BRADY:  Your Honor, I will rely on my submission

22   but briefly just highlight a few points.

23             THE COURT:  Yes, ma'am.

24             MS. BRADY:  Ms. Wen, as the court knows, is 50 years

25   old; she has no criminal history whatsoever.

E1G7WENS

1              THE COURT:  None whatsoever.

2              MS. BRADY:  None.  And I believe that her statement in

3     the sentencing submission, and my experience with her over

4     these several months, I believe her remorse is significant and

5     genuine.

6              THE COURT:  I think it is also based on certainly

7     these letters.  She certainly has extensive community support

8     as well from a wide range of people.

9              MS. BRADY:  And I'm asking the court to impose a

10    sentence of probation.  And my major concerns are that if she

11    were to be sent to jail she would be not only missing out on

12    her psychiatric counseling and treatment -- which she goes to

13    weekly, and she takes several medications -- but that simply

14    would not happen in the best of facilities in BOP.

15             The other concern is that she does have this $8800

16    that she needs to contribute to her son's tuition and

17    incidental expenses while he is at Cornell.  He is here in the

18    courtroom because he is on holiday break right now.

19             THE COURT:  Welcome.  He is quite a success story, and

20    that shows that she is a good mother -- a very good mother,

21    apparently -- and her son seems to be quite successful in

22    American society.  That's all to the good.  And it's important,

23    young man, that you stay in school, finish.  I am sure you

24    realize that.  Go ahead.

25             MS. BRADY:  Your Honor, I guess the last point that I

E1G7WENS

1    did make in both the objections to the PSR and also in my

2    sentencing submission, is I find it very difficult to reconcile

3    the fact that the same probation is recommending different

4    things for different defendants with the same offense level.

5    In the John Wang case --

6              THE COURT:  Well, because one presumes the history and

7    circumstances of the individual and the crime are different.

8    And, indeed, 18 U.S.C. 3553 mandates that the court take into

9    account the history and characteristics of the crime and the

10   individual, along with all the other factors in 18 U.S.C.

11   3553(a).

12             I saw that you pointed out two people that Judge

13   Patterson had sentenced to probation, and he also has sentenced

14   people to incarceration.  What are you telling me about the

15   people he sentenced?  I am not so much concerned about the

16   exact same crime, although obviously that's important, but we

17   need to know the circumstances of that crime and of the

18   individual, that individual's criminal record, if any, and

19   again all of the factors in 3553(a).

20             MS. BRADY:  My understanding, your Honor, is that the

21   four defendants in the John Wang case, the probation office

22   recommended probation, and in at least two of those defendants

23   their offense level was the same as Ms. Wen's, 14.

24             THE COURT:  Yes.  But actually what you have just done

25   is distinguish those individuals from this individual, because

E1G7WENS

1   you have said that the probation department there recommended

2   probation, and the probation department here, I believe -- I

3   can check -- agrees with the government's recommendation.

4           MS. BRADY:  That's correct.

5           THE COURT:  So you have actually now distinguished

6   this case from that case.

7           MS. BRADY:  I take that point, your Honor, but I

8   believe that no translator has been sentenced to incarceratory

9   time.

10          THE COURT:  She seems to be more than a translator.  I

11  thought she was a translator, but at least according to the

12  government now this seemed to be a full service operation which

13  she owned, and she had paralegals working under her.  And I

14  have seen a number of cases on East Broadway where people would

15  literally come into the office, and the heads of the office

16  would have file drawers with different stories, one that they

17  belonged to a house church and were persecuted, and the

18  subsection of that was that they were followers of Falun Gong

19  and were persecuted for that, hounded, and had a risk of

20  persecution.  Another set said that they had been forced to

21  have an abortion.  And another set of proposed stories said

22  that they were being persecuted for their political opposition

23  to the Chinese regime.  And the people are supposed to choose

24  one or the other and memorize them.  It sounds like she is

25  closer to that than to being a simple translator.

E1G7WENS

1          Certainly if she owned the place, and if the

2     paralegals are supplying these proposed stories --

3          MS. BRADY:  Your Honor, may I --

4          THE COURT:  -- that's different from being a

5     translator.  Go ahead, take your time.

6          MS. BRADY:  Ms. Wen employed one full-time and one

7     part-time paralegal at any given time.  I mean that was the

8     extent of the operation.

9          THE COURT:  And did the one full-time and one

10    part-time paralegal have scripts that they would provide to

11    these people?

12         MS. BRADY:  Your Honor, it is my understanding that

13    there are actually translators that were working for Ms. Wen

14    and that they would translate but also provide these questions.

15         THE COURT:  I'm saying this as a declarative statement

16    but I'm asking it as a question really.  Not questions that

17    were going to be asked based on the true history of the

18    applicant but, rather, a story for the applicant to tell that

19    the defendant knew was false.  Is that right?

20         MS. BRADY:  Yes.

21         THE COURT:  All right.  Thank you.

22         Is there anything else you wanted to say?

23         MS. MERMELSTEIN:  No, your Honor.

24         MS. BRADY:  Your Honor, as I say, I believe that the

25    cases that the government cited for incarceration time were all

E1G7WENS

1    lawyers.  There was one non-lawyer.

2            THE COURT:  Also, in my experience, normally the heads

3    of these mills are attorneys --

4            MS. BRADY:  Correct.

5            THE COURT:  -- and to that extent, you know, their

6    punishment should be appropriate.

7            MS. BRADY:  They are held to a higher standard, yes.

8            THE COURT:  That's a better way of phrasing it.

9            MS. BRADY:  No, your Honor, I would rely on our

10   submission.

11           THE COURT:  Government, things are changing here.

12   What's the position of the government?

13           MS. MERMELSTEIN:  Your Honor, the government feels

14   strongly that a guideline sentence is appropriate in this case.

15   To make one --

16           THE COURT:  No, I think a guideline sentence is too

17   high.  That's my current thinking.  The issue in my mind is

18   whether incarceration is appropriate or not.  But I didn't mean

19   to cut you off.

20           MS. MERMELSTEIN:  That's fine, your Honor.

21           First, I think it's actually -- based on the span of

22   cases that were all part of the same take-down in this case,

23   that as your Honor knows are before multiple judges -- it's not

24   the case that the person running the mills is sort of typically

25   a lawyer.  In many of the cases the person running the mill is

E1G7WENS

not a lawyer, and they are either paying to use the name of a

real lawyer, or they are sort of employing a real lawyer for

the need for the bar ID number.

THE COURT:  But is that the level that this defendant

is at?

MS. MERMELSTEIN:  No, we're not suggesting that she is

equal to the people who are running sort of huge mills, but I

think she has also mischaracterized the level of her

involvement.  And although I don't in any way doubt that she is

very sorry now, in her letter to the court she talks about how

she can easily be tricked and misled, and that sort of it was

out of a desire only to be helpful to people, and I think

that's not accurate.  This wasn't sort of an inadvertent

mistake into which the defendant fell where she ended up

helping someone.  This was a routine part of the business and a

way to make money.

And this wasn't sort of a secretive business.  It's no

great news to anyone involved here that there is massive asylum

fraud and it unfortunately can be relatively easy to accomplish

with certain stories through people who have in fact had these

experiences and have relayed them have a ring of truth.  So, I

think the defendant's characterization of her role and her

culpability is really minimizing what her responsibility was

here, because she was the person to whom these applicants were

coming.

E1G7WENS

1              So, first, I think the nature of her own

2      involvement --

3              THE COURT:  I had thought she was hired by a law firm

4      to be a translator.

5              MS. MERMELSTEIN:  The opposite in fact.

6              THE COURT:  Yes.

7              MS. MERMELSTEIN:  So, second of all, to talk

8      briefly -- although I don't think this seemed to be a point

9      that was of great interest to your Honor --

10             THE COURT:  I'm sorry.  Say that again.

11             MS. MERMELSTEIN:  Just to address briefly Judge

12     Patterson's sentences -- although your Honor seemed to

13     recognize that all defendants are different and it's hard to

14     compare apples and oranges -- but first I should say that the

15     government felt strongly that those probationary sentences were

16     not sufficient.  Obviously, Judge Patterson disagreed.

17             But I think that what can be seen in all of these

18     related cases that are now pending is that asylum fraud is just

19     a huge problem.  It is much too easy for people to come in and

20     take advantage of the stories that have the ring of truth and

21     to bog down the system, to force asylum officers to make

22     judgment calls about who is lying.  And there has to be some

23     general deterrence here, I think more than in some other cases.

24     Where everyone knows drugs are illegal, I don't think it's any

25     great surprise that if you sell large quantities of drugs, you

E1G7WENS

1    might go to jail.  But here there is almost a cavalier attitude

2    about the lies and about the fact that there is sort of no

3    victim of asylum fraud.

4              THE COURT:  You mean in the case of this defendant you

5    think she is being cavalier?

6              MS. MERMELSTEIN:  I don't think this defendant is

7    being cavalier.  I am saying that looking at the way in which

8    these kinds of mills operate, that applicant after applicant

9    after applicant is being told here is one that worked, you

10   draft it, you come back, no, no, here is some details that

11   would be better, that there is not a sufficient recognition of

12   the cost to the system, of the cost to the idea of asylum, the

13   idea to the actual people who are eligible for asylum.  So I

14   think in this case, as in all of these cases, there is a real

15   need for general deterrence, there is a real need to send a

16   message.

17             THE COURT:  I agree with you, I don't think this is an

18   issue of individual deterrence; I don't think this defendant

19   will ever do this again.  The issue is general deterrence, I

20   agree with that.  But how to effectuate that goal is what we're

21   talking about, as well as punishment.  Go ahead.

22             MS. MERMELSTEIN:  No, I think your Honor is exactly

23   right, that's the question.  And I think probationary terms

24   don't accomplish that.  I think that the message that has been

25   received, that we're seeing as other defendants communicate

E1G7WENS

with the government about cases that are still pending, is that

the probationary term is not a deterrent, it's not seen as

being taken seriously as a serious crime, and I don't think it

will serve as a deterrent.

        This is a case -- not this defendant's case in

particular -- but the take-down by the government of these

cases has received some real press attention in the Mandarin

language newspapers in New York.

        THE COURT:  Well, several of the letters say that the

letter writer was scanning the Internet and was surprised to

see that this defendant was involved because they never

imagined she would be involved in it.  Doesn't that go to

general deterrence?

        MS. MERMELSTEIN:  I don't think so, your Honor.  I

don't think it's sufficient that people learn that somebody who

did it has been arrested.  There has to be a significant

punishment.  There has to be a punishment that says that the

government takes this seriously, and that it is a serious

crime, that it's not going to be treated as sort of a minor

transgression.  So, I think an incarceratory term is absolutely

necessary.

        And it's been clear in the government's dealings with

other defendants that the general view of the probationary

terms has been that that's sort of the big win and that they

can sort of move on without thinking about it.  And I think

E1G7WENS

1    that's a big problem because there are massive, massive numbers

2    of asylum applications.  There are thousands and thousands of

3    applications filed every year in New York alone, and I think

4    this is really representative of sort of how prevalent the

5    fraud is.

6           80 and 90 percent of applications are rejected by

7    asylum officers in that first round interview in large part

8    because they are deemed to be fraudulent.  There are also cases

9    where someone is honest about a fact that makes them ineligible

10   are for asylum, but vastly more because of fraud.  This is a

11   massive problem, and the need for the word to be out that it

12   cannot continue is really significant.

13          In addition, I think this defendant, because of the

14   nature of her involvement, I think the just punishment includes

15   an incarceratory term.  So, I don't want to belabor the point,

16   but I think for those reasons a guideline sentence is

17   appropriate.

18          THE COURT:  Well, you mentioned several times the

19   other cases in what you characterize the as the take-down.  I

20   am not sure I am aware of what other cases there are in what

21   you call the take-down, so talk to me.  Is the government going

22   after the lawyers who are the heads of these things, or the

23   owners who are not lawyers of massive mills?  There is no

24   indication here that this was a massive mill.  I mean it is

25   illegal, but it doesn't sound like a massive operation.  So,

E1G7WENS

 1    what is involved in what you have said are other cases?

 2              MS. MERMELSTEIN:  There are a number of cases pending

 3    before Judge Patterson.  There is a case scheduled for trial on

 4    February 3 before Judge Marrero of an attorney, his name is Ken

 5    Giles.  I don't know that I can get all the indictment numbers

 6    matched correctly, but I believe that's 12 Cr. 935.  There is a

 7    nine defendant case going to trial before Judge Abrams in

 8    March.  That is a significant mill not run by lawyers, although

 9    lawyers were connected to and employed by the firms in order to

10    enable the work.  That particular case, those are two related

11    mills.

12              In any event, the government arrested 30 defendants as

13    a result of a wide-spanning asylum fraud investigation at

14    multiple different firms, and because it wasn't one conspiracy,

15    just the same sort of crime, those people were charged in

16    multiple indictments.

17              THE COURT:  Those people were charged --

18              MS. MERMELSTEIN:  -- in multiple indictments.  It's

19    not the government's contention that this defendant was at the

20    top of one of the biggest mills.  Those people are facing

21    guidelines, for example, in the range of 70 months.  So she is

22    not situated like them, as I think the plea agreement

23    indicates, and that's not the government's position.  But it's

24    also not the government's view that she is at the bottom.

25              THE COURT:  How did you come up with 25 to 99

E1G7WENS

documents?

MS. MERMELSTEIN:  I apologize, your Honor.  One moment.  The government's evidence indicated how many total asylum applications this defendant was involved in submitting, and in assessing what evidence would prove sort of how many of those were clearly fraudulent, that was the government's view of what it could prove at trial.

THE COURT:  Talk to me about the two defendants -- if you know who they are -- referenced by Ms. Brady.

MS. MERMELSTEIN:  The defendants before Judge Patterson?

THE COURT:  Yes, that's who she referenced.  And she references them in her defense submission as well.

MS. MERMELSTEIN:  I apologize, your Honor.  Obviously there are multiple AUSAs on the multiple cases, but my understanding of those defendants is that they were paralegal -- Liana Chen was an interpreter, and the other two were paralegals, and the fourth was a lawyer.  Judge Patterson I recall in at least one of those sentencings placed great weight it appeared on the relative unsophistication of the defendant as a person.  The defendant had an elementary school education, I think did not read or write in any language, and Judge Patterson opined that he thought it was possible that there had been some misunderstanding that drove things, notwithstanding obviously that the defendant was legally

E1G7WENS

guilty.  But it wasn't the full scope of intent that you might

expect, and his relative unsophistication, his lack of English

language abilities, might have led to his participation in the

crime.

I can't sort of standing here give you all the details

of all of the defendants, but I think that they are not wildly

dissimilarly situated from this defendant.  This defendant I

think had employees of her own; she was the first stop for

people.  I think she is fairly characterized as being more

culpable than them.  But I also think that, you know, there are

more culpable defendants than her.  She is sort of roughly in

the middle, I would say.

THE COURT:  Thank you.

Ms. Wen, the Federal Rules of Criminal Procedure give

you the right to address me.  You don't have to say anything.

You have the right not to say anything.  But if you want to

address me, as I say, you certainly have the right.  Now is the

time if you want to tell me anything.

THE DEFENDANT:  Honorable Judge, I believe you have

read my statement submitted to you, and I am deeply apologetic

and very sorry for my words and my behavior.

During this year after I have been arrested, I have

suffered both psychologically and physically, and I have paid a

great price myself.

I'm a 50 year old woman who should not have ended up

E1G7WENS

1    in this situation.  Especially I should not have let my son see

2    me in this type of situation.  If I had known back then this is

3    what would happen, absolutely I would not make this choice, I

4    would not do this.

5              After I reflected on myself, and I took time to

6    reflect and think of my own mistake, I feel deeply sorry and

7    repent for my mistake, and I plead for your Honor's leniency.

8              I promise I will be a better person.  I have

9    confidence in myself because I know deep down I'm a good

10   person.  I have the ability to criticize myself and to correct

11   myself.

12             I did not know what I have done was so wrong before,

13   and I have confidence in my friends and relatives.  I do

14   believe they will continue to support me, to make me to be a

15   better person, and to correct me if I make mistakes, to turn a

16   bad thing into something beneficial.

17             If your Honor and the government are willing to give

18   me an opportunity to forgive me, I'm willing to spend the rest

19   of my life to do good deeds, to serve the community and to

20   serve society.

21             I want to point out one fact.  At the time I pleaded

22   guilty to the amount of documents that were submitted for

23   application, the number 25 to 99 is the total number during the

24   entire five years I helped those people submit it, and I do not

25   know how many of those were fraudulent.

E1G7WENS

1       So, I want to make my apology to your Honor and to the

2   government one more time.

3       THE COURT:  All right.  Thank you very much.  I didn't

4   mean to cut you off, Ms. Wen.  If you have anything more to

5   say, you can; but I assumed you were finished.

6       THE DEFENDANT:  No more.  So help me God.

7       THE COURT:  All right, thank you.  I want to look

8   something up.

9       Ms. Wen, I do believe that you are extremely

10  remorseful.  I believe you regret very much what you did.  You

11  have a tremendous community support, as set forth in these

12  letters and by the fact that so many people are here today to

13  support you.  You can rely on that in the future.  You

14  obviously devoted a great deal of attention and effort to

15  raising a son who seems to be very successful.  All of that is

16  to the good.

17      I am concerned, however, about what is known as

18  general deterrence.  I don't think that individual deterrence

19  is a substantial issue in this sentencing, because I don't

20  think you ever are going to commit this crime again, but

21  general deterrence is very important, especially in the area of

22  immigration fraud.

23      You knew the stories were false.  You have allocuted

24  to that.  You were not simply a translator who translated

25  documents, and you played a not insignificant role in

E1G7WENS

1    conspiring to commit immigration fraud.

2            In part for punishment but also in large part for

3    general deterrence -- so that others know not to follow in the

4    path you have followed -- I do believe some incarceration is

5    appropriate.  I am not going to sentence you to the guideline

6    range, because I think that is too high, especially given the

7    apparent uncertainty of the number of documents that were false

8    and that you knew was false, because there is a technical point

9    that there is an increase of six levels due to the allocution

10   to 25 to 99 documents.  The levels fall off if the documents

11   were fewer.  And I also don't think the bottom of the guideline

12   of 15 months is appropriate.  I think it's greater than

13   necessary to meet the ends of the criminal justice system.  But

14   it is also appropriate that there be some incarceration here.

15           My intention is to sentence you to three months'

16   incarceration, to be followed by one year of supervised

17   release, with the conditions set forth in the probation

18   department report; and I will set those forth in a minute.  And

19   I do believe that that is an appropriate sentence.

20           I will hear argument from both sides, but my current

21   intention is not to require you to be remanded now, and that

22   you will be able to surrender at a later point.  That's my

23   intention.

24           Are there any formal objections by the defense or by

25   the government before I formally impose sentence?

E1G7WENS

1          MS. BRADY:  No, your Honor.  And I was intending to --

2     excuse me, your Honor.

3          THE COURT:  Yes.

4          MS. BRADY:  Your Honor, I had intended to ask the

5     court if you were going to impose an incarceratory sentence, to

6     let her surrender at a later date.

7          THE COURT:  That's my intention.  As I said, I will

8     hear argument.  The government may have a position after.  Do

9     you?

10          MS. MERMELSTEIN:  Your Honor, we have no objection to

11     sentence and no objection to your Honor setting a surrender

12     date.

13          THE COURT:  OK, no legal objection has been set forth

14     by either side.  I now will impose sentence.

15          I hereby find that the offense level is 14, the

16     Criminal History Category is I.  The guideline range is 15 to

17     21 months.

18          Pursuant to the Sentencing Reform Act of 1984, it is

19     the judgment of this court that the defendant Xia Ping Wen is

20     hereby committed to the custody of the Bureau of Prisons to be

21     imprisoned for a term of three months.

22          Upon release from imprisonment, Ms. Wen shall be

23     placed on supervised release for a term of one year, with the

24     conditions recommended by the probation department, namely the

25     following mandatory conditions:  Ms. Wen shall not commit

E1G7WENS

1   another federal, state or local crime; she shall not illegally

2   possess a controlled substance; she shall not possess a firearm

3   or dangerous weapon or destructive device; she shall refrain

4   from any unlawful use of a controlled substance.  I hereby find

5   that Ms. Wen is highly unlikely to abuse drugs or any

6   controlled substance and, therefore, I am waiving the mandatory

7   drug testing requirement.

8        Ms. Wen shall cooperate in the collection of DNA as

9   directed by a probation officer.  During the period of one year

10  of supervised release she shall comply with standard conditions

11  1 through 13, plus the following special conditions:  She shall

12  participate in a mental health program approved by the

13  probation office; she shall continue to take any prescribed

14  medications unless otherwise instructed by her healthcare

15  provider; she shall contribute to the costs of services

16  rendered not covered by third-party payment, based on her

17  ability to pay and the availability of third-party payment.  I

18  hereby authorize the release of available psychological and

19  psychiatric evaluations and reports to the relevant healthcare

20  providers.

21       Within 72 hours of release from the custody of Bureau

22  of Prisons, Ms. Wen shall report in person to the probation

23  office in the district to which she is released.  I am not

24  imposing a fine because I find Ms. Wen lacks the ability to pay

25  a fine, after taking into account the presentence report and

E1G7WENS

```
 1   her lack of assets, her modest income and her family's
 2   responsibilities.  I am also not imposing restitution, because
 3   I find that there is no victim within the parameters of 18
 4   U.S.C. 3663.
 5            I hereby order Ms. Wen to pay to the United States a
 6   special assessment of $100, which is due immediately.
 7            I have sentenced the defendant with all of the factors
 8   in 18 United States Code, Section 3553 in mind.  I have
 9   sentenced her below the guideline range.  I understand my
10   authority under the Booker and Fanfan cases, and I believe the
11   sentence is sufficient but not greater than necessary to meet
12   the ends of the criminal justice system.
13            The reasons why I have varied below the guideline
14   range under Booker and Fanfan is primarily because I believe
15   the defendant is genuinely remorseful, I believe there is
16   essentially no risk of recidivism, and because of the wide
17   range and deep community support shown on behalf of this
18   defendant.
19            Ms. Wen shall surrender to the institution designated
20   by the Bureau of Prisons on or before 2 p.m. on February 28,
21   2014.
22            MS. BRADY:  Is there any way we could have another
23   month, your Honor?
24            THE COURT:  Just a moment.  Is the government seeking
25   forfeiture?  I take it not.
```

E1G7WENS

1          MS. MERMELSTEIN:  No, your Honor.

2          THE COURT:  All right.  The reason for the month?

3          MS. BRADY:  Your Honor, she does have a number of

4    things to get in order, her apartment, her finances, and her --

5          THE COURT:  I have no objection to that.  The

6    surrender date will be March 28, on or before 2 p.m.

7          Ms. Brady, are you aware of any legal reason why the

8    sentence should not be imposed as I have stated it?

9          MS. BRADY:  No, your Honor.

10          THE COURT:  Ms. Mermelstein?

11          MS. MERMELSTEIN:  No, your Honor.

12          THE COURT:  I hereby order the sentence to be imposed

13    as I have stated it.

14          Is there a limited waiver of appeal rights here?

15          MS. MERMELSTEIN:  Your Honor, I believe there is,

16    although I confess I'm not certain.  I assume there is.

17          MS. BRADY:  I think that's right.

18          THE COURT:  What do you think is right?  Is there a

19    waiver of rights in the plea agreement?

20          MS. BRADY:  I believe there is.  I don't know if I

21    have it with me either.

22          THE COURT:  Well, I'm going to take a look at it.  I

23    don't want to give her advice that's inaccurate.  I'm going to

24    take a look for it.  Normally I don't keep those.

25          MS. BRADY:  Your Honor, Ms. Wen says that she did give

1    up the right to appeal.

2            THE COURT:  All right.  My records do not have it;

3    they normally don't.  I return those to the prosecutors.

4            Ms. Wen, you have the right to appeal the sentence I

5    just imposed on you.  If you cannot pay the cost of an appeal,

6    you have the right to apply for leave to appeal in forma

7    pauperis.

8            I do wish to inform you -- which you apparently

9    already know -- that in your plea agreement you agreed to waive

10   your right to appeal, and you agreed to waive your right to

11   collaterally attack the sentence I imposed if I impose a

12   sentence that is 21 months or below.  And I certainly have done

13   that, because I sentenced you to three months' incarceration.

14           If you request, the clerk of the court will prepare

15   and file a notice of appeal on your behalf immediately.  Do you

16   understand your appeal rights?

17           THE DEFENDANT:  Yes.

18           THE COURT:  The government, I take it there are no

19   open counts?

20           MS. MERMELSTEIN:  No, your Honor.

21           THE COURT:  All right.  Ms. Wen, I have sentenced you,

22   as I say, largely because of the concern of general deterrence,

23   that is, that others not do what you did, that others

24   understand that you cannot assist people in illegally obtaining

25   asylum here in the United States.  You weren't simply a

E1G7WENS

 1    translator; you had a larger role.  You have a lot of skills,

 2    obviously.  You have been trained scientifically.  You do have

 3    skills as a translator.  It sounds like you also have

 4    managerial and supervisory skills.  When you get out of prison,

 5    please, make sure you use those skills in legal ways.

 6          You have a great deal to contribute to your community;

 7    just do it legally.  Make sure I don't see you again.

 8          And I want to address Mr. Wen, Ms. Wen's son, for a

 9    moment.  Mr. Wen, your mother is not a bad person by any

10    stretch of the imagination.  I am sure you understand that.

11    She has scores of letters of all the good things she has done.

12    She did something, however, that's illegal.  She did something

13    that was wrong, but she has devoted a great deal of her life to

14    raising you correctly with the right standards and the right

15    values, and it sounds like you are well on the way to becoming

16    a responsible adult.  Don't let this change your view of your

17    mother.  She is going to need your support over the next six

18    months.  She is out for a couple of months, and she will be in

19    for three months.  Make sure you give it to her.  OK?  She is

20    not a bad person.  It's important that you stay in school and

21    graduate.  Do you understand that?

22          MR. WEN:  Yes.

23          THE COURT:  All right.  Thank you very much.

24                              * * *

25